**William CODY, Plaintiff,**

v.

**E. JONES, Supt., Great Meadow Correctional Facility, Defendant.**

**No. 87–CV–539.**

United States District Court, N.D. New York.

July 28, 1995.

Bond Schoeneck & King, Syracuse, NY, for plaintiff; Thomas R. Smith, of counsel.

Dennis C. Vacco, Attorney General of the State of New York, Albany, NY, for defendant; Mary Ellen Clerkin, Assistant Attorney General, of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

On July 13, and July 14, 1995, the court conducted a non-jury trial in this case. At the close of the proof the court indicated that perhaps it would render a decision from the bench on July 18, 1995. After further reflection, however, and in large part because the court is being called upon, among other things, to interpret and apply the Supreme Court's recent decision in *Sandin v. Conner,* — U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the court has decided that a written decision is warranted.[1] In accordance with Fed.R.Civ.P. 52(a), the court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

For purposes of analysis, the facts can be neatly divided into two time frames.[2] The first commences on February 12, 1987, when plaintiff William Cody arrived at Great Meadow Correctional Facility ("Great Meadow" or "the facility"), and runs through March 16, 1987. One day later James Stinson, then Deputy Superintendent of Security at the facility,[3] issued two "interdepartmental communications" impacting on protective custody inmates.[4] Basically, the first such

---

1. As will become readily apparent later on in this decision, the court disagrees with plaintiff's position that "the *Sandin* decision should have no effect on the outcome of th[is] case...." Letter of Thomas R. Smith to Court (July 11, 1995) at 1.

2. As will be more fully discussed herein, only the first time frame was the subject of plaintiff's complaint.

3. Stinson is currently the Superintendent at Great Meadow.

4. One of the main purposes of protective custody, according to Stinson, is to protect inmates from enemies within the general population. Plaintiff Cody sought voluntary, as opposed to involuntary, protective custody because of the nature of his offense, having some relationship to organized crime, meant that he had enemies within the prison system, and he specifically

communication provided that those inmates were to receive a total of three hours out-of-cell time per day. Plaintiff's exh. 25. The second Stinson communication established an out-of-cell meal program, for two meals per day, for protective custody inmates.[5] Plaintiff's exh. 26. The primary purpose of those two orders was to implement the Department of Correction's ("DOC") Directive 4948, which will be discussed in some detail herein.

The second relevant time frame is from March 17, 1987, through July 25, 1987. On that latter date, plaintiff Cody was assigned to C block, company 2. Plaintiff's exh. 3. Defendant Everett Jones, the Facility Superintendent, testified that the C–2 unit was created to house only protective custody status inmates. These two time frames are significant because during the first, plaintiff claims, in essence, that he was not timely placed in protective custody; and that even after he was so classified, he did not receive the attendant privileges of that status, such as three hours out-of-cell time, two of which should have been for meals. Nor, claims plaintiff, did he receive one hour out-of-cell outdoor exercise time. Similarly, plaintiff claims that during the second time period he did not consistently receive two out-of-cell meals per day. He also purportedly did not consistently receive one hour of outdoor recreation during that time. And although it was not heavily emphasized during the trial, plaintiff is also claiming that when he did get to go outdoors for exercise, he was forced to walk through the rotunda where, at times, he was exposed to the general population; and also that non-protective custody inmates were allowed to mix with protective custody inmates during recreation time. Apparently plaintiff believes that his security as a protective custody inmate was compromised by these latter two situations. Plaintiff contends that these various alleged deprivations amounted to a violation of his right to due process under the Fourteenth Amendment, as well as a violation of his Eighth Amendment right to be free from cruel and unusual punishment.

There are several Great Meadow "interdepartmental communications," as well as two DOC Directives, all of which were received into evidence during the trial, and which help to place plaintiff Cody's claims, particularly his due process claim, in context. On August 8, 1986, R. Juckett, a captain at Great Meadow, issued an interdepartmental communication advising all corrections personnel that effective that date, "[I]nmates being processed for Voluntary or Involuntary protection status will be afforded their privleges [sic] unless lost through the disciplinary process, or indicated in writing by a supervisor." Plaintiff's exh. 12. A couple of months later, on October 1, 1986, Great Meadow implemented a procedure whereby an inmate requesting voluntary protection custody status would not be confined to his or her cell for more than seventy-two hours, after which the inmate must be transferred to another housing unit; scheduled for transfer to another facility; released from such confinement; or placed in protective custody. Plaintiff's exh. 9.

In addition, prior to plaintiff's transfer to Great Meadow, on November 6, 1986, DOC issued a Directive, classification 4948, which was the subject of much testimony during the trial. That Directive sets forth "the minimum conditions of confinement for inmates in Protective Custody Status within the Department [DOC]." Plaintiff's exh. 6. Several parts of that Directive have direct bearing on this case because plaintiff Cody claims that he was not regularly given those minimum conditions of confinement from the time he first arrived at Great Meadow in February, 1987, until he was eventually transferred to the C–2 unit in July, 1987. As previously mentioned, one of plaintiff's objections to his confinement at Great Meadow is that he was not afforded the opportunity to be out of his cell for the three hour minimum provided for

identified some of those enemies to prison officials. *See* Plaintiff's exh. 4.

**5.** The order establishing this program was initially issued March 17, 1987, and Stinson testified

that it was also effective on that date, but the March 18, 1987 order had to be issued to clarify a clerical error in the March 17, 1987 order.

in that Directive.[6] Of the three hours out-of-cell time required by that Directive, a minimum of one hour must be scheduled for outdoor exercise. *Id.* at 2, ¶ IV(A). That Directive further provides that the additional two hours out-of-cell time be used for, but is not limited to, the following activities: "1. Gallery or yard recreation, 2. Meals, 3. Telephone calls, 4. Showers, 5. Visiting, and/or 6. Gallery programs." *Id.* Gallery recreation is defined as including "opportunities for inmates to participate in passive board games, watch television, play cards, read, or write outside of their cells." *Id.* at 2, ¶ IV(B)(2). With respect to meals, Directive 4948 explicitly states that "Inmates in Protective Custody Status will be afforded the opportunity to participate in two meals per day outside of their cell." *Id.* at 3, ¶ V I(C)(1). The Directive does include exceptions to that two meal out-of-cell policy, but neither of those exceptions are applicable here.

Provision for out-of-cell exercise is not limited to protective custody inmates. In another DOC Directive, this one dated March 18, 1976, it states, in relevant part that "[E]very inmate shall be permitted to exercise outside of his cell for at least one hour each day and where weather permits such exercise shall be permitted out of doors." Plaintiff's exh. 8, at 5, § 301.5(b) (emphasis added). Stinson testified that this Directive was in effect in February, 1987, when plaintiff first arrived at Great Meadow. Likewise, in an October 1, 1986, Great Meadow Interdepartmental Communication from then Deputy Superintendent of Security Hollins, it directs that "Effective immediately, each population inmate who is on cell confinement is entitled to a one hour daily exercise period, unless he is deprived of such exercise period by lawful deprivation order, by medical order, or at administrative direction." Plaintiff's exh. 10. Just one day before that communication was issued, Hollins sent out a similar communication detailing the procedures to be followed by facility personnel in connection with the

exercise period for, among others, protective custody inmates. *See* Plaintiff's exh. 11.

Especially with respect to plaintiff's due process claim, it is necessary for the court to make fairly detailed and specific findings of fact as to exactly what his conditions of confinement were from February 12, 1987, through July 25, 1987. Before being transferred to Great Meadow, plaintiff Cody had been incarcerated at Auburn Correctional Facility where he had been afforded voluntary protective custody status based upon the nature of his crime. Plaintiff's exh. 4. Immediately upon arriving at Great Meadow, Cody testified that he requested, *inter alia,* that he wanted to continue his voluntary protective custody status. Despite the seventy-two hour time frame for acting on a protective custody request provided for in the facility's interdepartmental communication of October 1, 1986, it was not until February 19, 1987, seven days after his arrival at Great Meadow, that the acting superintendent approved plaintiff's request. Plaintiff's exh. 13; *see also* plaintiff's exhs. 14B and 14C; and Response to Interrogatories (Dec. 20, 1991), at 4, No. 7. Stinson explained that this slight delay was bureaucratic in nature; it took five days to process the paperwork through the hierarchy and to advise plaintiff that he had been approved for protective custody status.

From February 12, 1987, through February 13, 1987, plaintiff Cody was housed in D-1, a unit for transients. Response to Interrogatories at 4, No. 5. Mr. Stinson testified that all incoming inmates, regardless of status, are temporarily assigned to D block. On February 13, 1987, plaintiff was moved from block D to the E-8 unit, which was used to house protective custody overflow. Response to Interrogatories, at 3, No. 3. Following an interview with prison officials,[7] on February 24, 1987, plaintiff's status was changed to protective custody, but he remained on the E-8 unit, with a mixed inmate population, from that date until July 25, 1987.

---

6. Plaintiff did remain incarcerated at Great Meadow after July 25, 1987, but obviously his complaints as to his conditions of confinement, and which are the subject of this lawsuit, are limited to the time frames previously identified.

7. *See, e.g.,* plaintiff's exh. 22.

Stinson described the E–8 unit as a "closed company," where protective custody status inmates of both types were housed, as well as inmates who were under special watch either because of their medical or mental status. *See also* Response to Interrogatories at 4, No. 5 ("E–8 is a unit consisting of inmates with a variety of statuses which require special monitoring, such as: overflow inmates from protective custody, inmates who are on 'special watch' for whatever medical or mental reasons, orientation inmates."). In addition to housing protective custody inmates on E–8, in February, 1987, some protective custody inmates were also housed on F-block. The protective custody inmates were housed in different parts of the facility because at that time there was no unit at Great Meadow designated to house solely protective custody inmates.

Between February 13, 1987, and March 17, 1987, while plaintiff was housed on the E–8 unit, he testified that he did not have the opportunity to go outside to exercise. In fact, plaintiff's recollection is that he was first given that opportunity on approximately March 25, 1987. As will be more fully discussed below, plaintiff's recollection is undermined somewhat by several notations in the E-block log book indicating that outdoor recreation was available on that block prior to March 25, 1987. Regardless, plaintiff Cody likewise testified that until March 17, 1987, he was required to have all of his meals in his cell.[8] Also, before that date, plaintiff stated that he had *no opportunity for gallery recreation time*, such as playing cards, playing board games, or watching television. After a protective custody status inmate finishes his or her meal, recreation activities such as those just listed are available for the remainder of the time allotted for the out-of-cell meal.

During the trial, plaintiff's claim that he received absolutely no outdoor recreation from February 12, 1987, through March 17, 1987, was eroded somewhat when he admitted on cross-examination that during the first month or so on which he was housed on E–8,

exercise was generally offered in the morning. Consequently, because plaintiff was moving onto that unit on February 12, 1987, he did not arrive in time for exercise that day. Furthermore, relying primarily upon portions of the E-block log book, it was shown through cross-examination of plaintiff that on March 1, 1987, he received recreation time. *See* Plaintiff's exh. 15, at p. 70. In the face of a specific notation in the log book that plaintiff had recreation time on that day, plaintiff claims, incredibly, that the Corrections Officers ("C.O.") just put his cell number in the log book, but that they did not actually open his cell door so he could leave for recreation time. In any event, the credible proof adduced at trial shows that on February 18, 1987, and again on February 24, 1987, plaintiff was escorted out of his cell for a visit, and in fact, the visit on the twenty-fourth was extended—from 9:23 a.m. through 2:19 p.m. *Id.* at 55, and 63–64. Because of those visits, which were out-of-cell, plaintiff necessarily missed the outdoor exercise period on those days. By the same token, however, although plaintiff missed the one hour exercise time on those days, he enjoyed significantly more out-of-cell time by virtue of those visits than he would have received had he simply participated in the recreation time.

Less than one week later, on March 2, 1987, plaintiff again was off the unit for an extended period of time—from 9:20 a.m. through 3:10 p.m. Plaintiff had another out-of-cell visit on that day. The log book indicates that the inmates on that block returned from the yard at 3:22 p.m., shortly after plaintiff had returned from his visit, and so he again missed an exercise opportunity due to a visit. *See id.* Then, on March 6, 1987, plaintiff left the facility at 11:20 a.m. for a medical trip, and he did not return until 5:56 p.m. that same day. *Id.* at 77–78. The log book shows that E-block inmates returned from the yard at 3:21 p.m. on that day. *Id.* Thus, another instance where plaintiff missed

---

8. Originally plaintiff testified that he received all of his meals in his cell until March 25, 1987. After his memory was refreshed by referring to the E-block log book, which indicates that out-of- cell meals were offered as early as March 17, 1987, plaintiff agreed that he began receiving meals out of his cell on that date.

outdoor recreation because of other out-of-cell obligations.

George Merton, a housing unit sergeant, who was responsible for supervising, among other areas, the E-block during the time at issue, likewise testified that on February 16 and 17, 1987, protective custody inmates were given outdoor recreation time. Plaintiff's exh. 15 at 54 and 56. Outdoor recreation for both voluntary and involuntary protective custody inmates was also available on February 22, 1987, although the log book is silent as to whether or not plaintiff actually went on that day. *See id.* at 61. There is, however, a specific notation in the log book that plaintiff, who at the time was housed in cell number 37, went to recreation on March 3, 1987. *Id.* at 70. It should be noted, however, that although the court finds that plaintiff at least had the opportunity to participate in recreation on those days where the availability of the same is specifically noted in the log book, the court is fully aware that, as Sergeant Merton strongly implied, there may well have been other times when exercise was available to protective custody inmates prior to March 17, 1987, but that it was not mentioned in the log book. In the absence of someone whose job duties were only to record all of the comings and goings on a given block, it would be unreasonable to expect that the log book would contain every movement by the inmates during a given twenty-four hour period. Based upon all of the foregoing, the court finds that from February 12, 1987, through March 17, 1987, plaintiff did not receive the opportunity for one hour outdoor exercise for, at most, twenty-four days. The court hastens to add that this calculation is not cast in stone. It may well be that plaintiff also had other exercise opportunities which were not noted in the log book and which he does not recall now—some eight years after the fact. In any event, plaintiff also did not receive any of his meals out-of-cell during that time; and that is undisputed.

By plaintiff's own admission, his conditions of confinement did change after March 17, 1987, when Stinson issued the orders establishing the out-of-cell meal program, and requiring that protective custody inmates receive a total of three hours out-of-cell time per day. Plaintiff testified that after that date, depending upon the availability of C.O.s, he did receive meals out-of-cell, although he did not always receive two meals out-of-cell per day. In a similar vein, plaintiff also testified that he believed that he was first given the opportunity for gallery recreation on March 16, 1987. Plaintiff further testified that in mid-March, 1987, he was also allowed to participate in outdoor recreation, although the yard area provided was, by plaintiff's estimation, only thirty by twenty-five feet, and it did not contain any weights or sports equipment. Between March 16, 1987, and July 25, 1987, when he was moved from E–8 to C–2, plaintiff candidly testified that he usually received at least one hour of out-of-cell time per day, and that he sometimes, but not always, got a total of three hours out-of-cell time during that period, but he again stressed that it depended upon the availability of corrections personnel.

In contrast, after July 25, 1987, when plaintiff was moved to the protective custody unit, C–2, he consistently received three hours out-of-cell time per day. The outdoor recreation yard was larger, so, for example, the inmates could play football. A television, cards and board games, such as checkers, were also provided for gallery recreation on that unit. After that date plaintiff also received his allotted two meals out-of-cell daily.

During his entire tenure at Great Meadow, it is undisputed that no disciplinary action was taken against plaintiff. Early on in his stay, when he inquired as to why he was not being let out of his cell, plaintiff claims that he was told that he was under investigation due to his protective custody status request. Frustrated by his situation, plaintiff drafted the complaint in this action, which he signed on April 29, 1987—before he was moved to the C–2 unit. After drafting the complaint, plaintiff had a C.O. notarize it, and then plaintiff gave the complaint to another C.O. for processing, although he is not sure exactly when he did that. Sometime after April 29, 1987, plaintiff acknowledged that a sergeant came to talk to him about the allegations contained in his complaint, but plaintiff freely admits that he never spoke to defen-

dant Jones, the only remaining defendant, about those allegations. Indeed, because defendant Jones was absent from the facility for medical reasons from February 5, 1987, when he was hospitalized on an emergency basis for intestinal bleeding, until he returned to the facility in May, 1987, it would have been impossible for plaintiff to have spoken to Jones about his concerns during this time frame.

Defendant Jones testified generally about how it came to be that by July, 1987, Great Meadow had a unit for protective custody status inmates only, whereas it had no such unit prior to that time. After the DOC issued Directive 4948, Jones was trying to obtain the permission of DOC's Commissioner to maintain the E–8 unit as a Special Housing Unit ("SHU"). According to Jones, on a unit with that designation, the more restrictive rules governing SHU assignment would be followed by the whole unit. Between the time Jones made that request of the Commissioner and February 5, 1987, when he was hospitalized, Jones conceded that he had some knowledge that protective custody inmates who were housed on E–8 were not routinely receiving three hours out-of-cell time daily.[9] Jones suggested that security was the reason that those inmates were not routinely receiving their permitted daily three hours out-of-cell time. More specifically, Jones explained that it represents a threat to security if while the E–8 unit was treated as an SHU, a protective custody inmate, who is allowed to receive commissary and packages privileges,[10] is housed next to an SHU inmate who does not have those same privileges. The danger arises because in that situation an SHU inmate may come into possession of something that he or she has been forbidden to have because of their SHU status. In other words, to put it bluntly, under defendant Jones' rationale, on a unit such as E–8, where the status of the inmates varied, an inmate's conditions of con-

finement were determined, in large part, by the status of the inmates having the fewest privileges.

Insofar as defendant Jones' personal involvement with plaintiff Cody is concerned, the record evidence clearly demonstrates that he had no involvement—either direct or indirect—from February 12, 1987, through March 17, 1987. As noted earlier, his lack of direct, personal involvement during that time stems from the fact that he was out of the facility on medical leave. Defendant Jones was discharged from the hospital on February 15, 1987, and after that he recuperated at home until May, 1987, when he returned to work as the Facility Superintendent. While he was recuperating at home, the Acting Superintendent in Charge, Deputy Superintendent Van Zandt did visit Jones from time-to-time, but no mention was made of plaintiff Cody during those visits. The fact that Van Zandt did not mention plaintiff Cody by name is certainly understandable given the prison population at the time, roughly 1,500 inmates. In that setting, it seems highly unlikely that a superintendent, acting or otherwise, would know about specific inmate complaints, unless the prisoner contacted the superintendent directly when he happened to be on that prisoner's block, as Jones testified he was occasionally; or unless the prisoner sent a sealed letter to the superintendent, which Jones also testified was done on occasion.

It was not until June, 1987, when defendant Jones received the summons and complaint in this action, that he first became aware of plaintiff and his dissatisfaction with the conditions of his confinement on E–8. Jones' recollection as to exactly what he did after that is a bit vague. He believes that he read the complaint when he got it, and that he probably conducted an investigation, but by then, in light of the anticipated move of the protective custody status inmates to C–2, he viewed plaintiff's complaint as a "correct-

---

**9.** It should be noted, however, that that was before plaintiff even arrived at Great Meadow. Furthermore, Stinson, who was Deputy Superintendent for Security at the time, testified that from February, 1987, through July, 1987, he was not personally aware of any systematic violations of the facility procedures governing protective custody inmates. Stinson also testified that after

the issuance of the interdepartmental communications which he drafted (that is, after March 17, 1987), he was not personally aware that those orders were not being followed on the E–8 unit.

**10.** Plaintiff's exh. 6 at 5, ¶ IV(H).

ed problem." Significantly, before receiving that formal complaint, Jones never received any complaints from plaintiff Cody, despite the availability of a grievance mechanism at the facility for such complaints. Plaintiff was aware of that facility grievance procedure, and in fact, he used it to complain about not getting certain medications, but he testified that he did not file a grievance pertaining to lack of recreation time. Unaware that Jones was away from the facility on sick leave, plaintiff does claim that he wrote Jones regarding the conditions of his confinement, but that he never got an answer. Unlike plaintiff's March 27, 1987, letter to Stinson regarding medication,[11] and his February 18, 1987, letter sent to Stinson (presumably referring to his protective custody status requests),[12] no documents which plaintiff claims to have sent to Jones were ever introduced into evidence. According to plaintiff, that omission is because when he was moved to the C–2 unit in July, 1987, a lot of his paperwork disappeared, and he assumes those letters were among them. Taking all of the foregoing into account, the court has no reason to disbelieve Jones's testimony that until June, 1987, he had no knowledge of plaintiff's complaints as to his conditions of confinement.

Before turning to the specific allegations of this lawsuit, the court makes a few additional findings of fact which help to give a more complete picture as to what steps the prison officials at Great Meadow were taking to fully implement Directive 4948. Despite that fact that Great Meadow did not officially promulgate rules and/or procedures implementing Directive 4948 until March 17, 1987, when Stinson issued the two interdepartmental communications previously discussed, it appears to the court that the responsible prison officials were not sitting idly by between November 6, 1986, the date of that Directive, and March 17, 1987. Rather, as defendant Jones testified, for part of that time they were waiting for word from the DOC Commissioner as to whether, in effect, they would have to create a unit devoted exclusively to protective custody inmates.

Moreover, perhaps anticipating that they would not be successful in that request, Jones testified that as early as October, 1986, even before the issuance of Directive 4948, Deputy Superintendent Hollins began drafting procedures providing for recreation opportunities for E–8 inmates. Finally, in the court's opinion, from November, 1986, through July, 1987, which defendant Jones aptly described as a "transition stage," given the demands on space at Great Meadow, combined with the fact that the inmates there had a wide variety of classifications, which the facility was trying to accommodate, the officials were making a reasonable effort to fully implement Directive 4948 in as timely a manner as possible under rather adverse circumstances.

## CONCLUSIONS OF LAW

In his complaint, brought pursuant to 42 U.S.C. § 1983, plaintiff set forth a number of causes of action against three State defendants. On March 25, 1994, Magistrate Judge Ralph Smith issued a report-recommendation, which this court adopted in its entirety on May 23, 1994. The Magistrate Judge recommended, and this court concurred, that defendants' motion for summary judgment be granted as to two of the three defendants, but denied as to the third, Great Meadows Superintendent Everett Jones. As to that lone defendant, the Magistrate found that "a genuine issue of material fact exists with regard to the personal involvement of defendant Jones" with respect to plaintiff's allegations that he was confined to his cell for up to twenty-four hours a day from February 13, 1987, through March 16, 1987; and that to take advantage of outdoor recreation opportunities, he had to walk through unsecured areas of the general prison population and allow himself to be confined in a recreation yard with non-protective custody inmates. Report–Recommendation at 7 and 10.

Even though both the complaint and the Report–Recommendation confine the time period of plaintiff's allegations to the approximately one month period from February 12, 1987, through March 16, 1987, during the

---

**11.** Plaintiff's exh. 17.

**12.** Plaintiff's exh. 21.

trial it became clear that the parties were treating plaintiff's alleged constitutional violations as having arisen during two separate time periods—the one just mentioned, as well as from March 17, 1987 through July 25, 1987, when plaintiff was eventually assigned to C–2, a protective custody unit. Thus, even though plaintiff's complaint does not include that latter period, because both parties tried the case as though that time frame was also at issue, as Rule 15(b) permits, the court is treating the issue of whether plaintiff's constitutional rights were violated from March 17, 1987, through July 25, 1987, as though such allegations had been contained in plaintiff's original complaint. *See* Fed. R.Civ.P. 15(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.").

Having determined the scope of plaintiff's allegations herein, the court is now in a position to address the merits of his constitutional claims. First, the court will address plaintiff's claim that his Fourteenth Amendment due process rights were violated when he did not uniformly receive two meals out-of-cell per day, one hour daily outdoor recreation, and a total of three hours out-of-cell time per day, and when purportedly he was exposed to the general population on the way to the exercise yard and while there. The court will then turn to a consideration of plaintiff's Eighth Amendment claim that he did not receive one hour of daily outdoor exercise. As the court understands it, that claim is limited to the first time period at issue herein—from February 12, 1987, through March 17, 1987, when plaintiff was housed on the E–8 unit.

## I. Due Process

Without making any broad, sweeping pronouncements as to the impact of *Sandin* on other pending litigation wherein a plaintiff inmate is claiming a due process violation, in the present case, the court is forced to conclude that under *Sandin* plaintiff Cody's due process claim lacks merit.[13] The Supreme Court in *Sandin* addressed the relationship between prison regulations and liberty interests that the due process requirements enunciated in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), are intended to protect.[14] The inmate in *Sandin* asserted that his placement in disciplinary segregation for thirty days violated his constitutional right to procedural due process. The district court held that the inmate (Conner) had no liberty interest in being free from punitive segregation. On appeal, the Ninth Circuit reversed, holding that the inmate did have a protected liberty interest in being free from punitive segregation. *Conner v. Sakai*, 15 F.3d 1463, 1466 (9th Cir. 1993). The basis for that finding by the Ninth Circuit was language in the regulation at issue requiring that the prison disciplinary committee find guilt, and thus impose disciplinary segregation, only if there was substantial evidence of misconduct. *Id.* Reversing the Ninth Circuit, the Supreme Court found that inmate Conner had neither a state created liberty interest, nor a liberty interest arising from the Due Process Clause.

Recognizing, as it has previously, that "[p]risoners do not shed all constitutional rights at the prison gate," [15] the Supreme Court nonetheless reiterated that "'lawful incarceration brings about the necessary withdrawal or limitation of many privileges

---

13. "The Supreme Court's decision in *Sandin* applies retroactively to the instant case because the Court applied the rule announced in *Sandin* to the parties in that case. *See Harper v. Virginia Dep't of Taxation*, —— U.S. ——, ——, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993) (no court may refuse to apply rule of federal law retroactively once the Court applies it to the parties before it)." *Mujahid v. Meyer*, 59 F.3d 931, 932 n. 2 (9th Cir.1995); *see also Uzzell v. Scully*, 893 F.Supp. 259, 263 n. 8 (S.D.N.Y.1995) (internal quotations and citations omitted) ("The *Sandin*

ruling should apply retroactively to the case at bar for as a rule, judicial decisions apply retroactively."). As the foregoing amply demonstrates, even though this lawsuit predated *Sandin* by slightly more than eight years, *Sandin* applies retroactively here.

14. The Supreme Court in *Wolff* delineated the due process rights which must be accorded a prisoner in disciplinary proceedings.

15. *See Wolff*, 418 U.S. at 555, 94 S.Ct. at 2974.

and rights, a retraction justified by the considerations underlying our penal system.'" *Sandin,* — U.S. at —— ——, 115 S.Ct. at 2300 (quoting *Jones v. North Carolina Prisoners Labor Union,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977) (quoting in turn *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1059, 92 L.Ed. 1356 (1948)). The Court concluded its discussion of Conner's potential liberty interest under the Due Process Clause by stating, "Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law." *Id.* — U.S. at ——, 115 S.Ct. at 2301.

The Court then went on to hold that inmate Conner also had no state created liberty interest.[16] In reaching that conclusion, the Court specifically rejected the approach taken in *Hewitt:*

> Instead of looking to whether the State created an interest of 'real substance' comparable to the good time credit scheme of *Wolff,* the Court asked whether the State had gone beyond issuing mere procedural guidelines and had used 'language of an unmistakably mandatory character' such that the incursion on liberty would not occur 'absent specified substantive predicates.' Finding such mandatory directives in the regulations before it, the Court decided that the State had created a protected liberty interest.

*Id.* — U.S. at —— —— ——, 115 S.Ct. at 2298 (quoting *Hewitt,* 459 U.S. at 471–472, 103 S.Ct. at 870–871). Abandoning the *Hewitt* analysis, the Court returned to a focus on the nature of the deprivation, rather than the mandatory nature of the prison regulation. The Court's rationale for this shift was that the *Hewitt* analysis "produced at least two undesirable effects." *Id.* at ——, 115 S.Ct. at 2299. "First, it creates disincentives for States to codify prison management procedures in the interest of uniform treatment." *Id.* at ——, 115 S.Ct. at 2299. "Second, [that] approach has led to the involvement of federal courts in the day-to-day management

of prisons, often squandering judicial resources with little offsetting benefit to anyone." *Id.* at ——, 115 S.Ct. at 2299. Involving the courts in day-to-day management of the prison system has, in the Supreme Court's view, "run counter to the view expressed in several of our cases that federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Id.* (citations omitted). The Court was also persuaded to depart from *Hewitt* because that approach "encouraged prisoners to comb regulations in search of mandatory regulations on which to base entitlements to various state-conferred privileges." *Id.* at ——, 115 S.Ct. at 2299. Thus, irrespective of the language of the governing regulation or statute, the Supreme Court held that a liberty interest protected by the Due Process Clause may arise only "under certain circumstances." *Id.* at ——, 115 S.Ct. at 2300 (citation omitted).

More particularly, the Supreme Court held that "[t]hese interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at —— —— ——, 115 S.Ct. at 2300 (citations omitted). In the case of inmate Conner, the Supreme Court found that he had no state created liberty interest because his discipline in segregated confinement did not satisfy that standard. *Id.* at ——, 115 S.Ct. at 2301 (footnote omitted). The Court offered three justifications for its holding: "(1) disciplinary segregation mirrored conditions of other forms of completely discretionary confinement; (2) based on a comparison between inmates inside and outside disciplinary segregation, the state's action in placing him there for 30 days did not significantly disrupt Conner's environment; and (3) the state's action did not affect the duration of Conner's sentence." *Christie v. Barrington,* No. 94–1653, 1995 WL 417615, *3 (7th Cir. July 13, 1995) (citing *Sandin* ).

---

16. "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983).

■ In the present case, the court finds that plaintiff cannot satisfy this new standard as articulated by the *Sandin* Court. Under *Sandin*, "[a]s a threshold matter, courts are directed to determine whether the 'conditions suffered were expected within the contour of the actual sentence imposed.'" *Pryor–El v. Kelly*, 892 F.Supp. 261, 271 (D.D.C.1995) (quoting *Sandin* —— U.S. at —— n. 9, 115 S.Ct. at 2301 n. 9); *see also Austin v. Lehman*, 893 F.Supp. 448, 453 (E.D.Pa.1995) (citations omitted) ("Under *Sandin's* new methodology, ..., the seriousness of the deprivation suffered guides the recognition of state-created liberty interests."). Certainly, the conditions under which plaintiff Cody was confined prior to July 25, 1987, are "expected within the contours of the actual sentence imposed." *See Sandin*, —— U.S. at ——, 115 S.Ct. at 2301 n. 9. To be sure, prior to July 25, 1987, plaintiff did not always receive one hour outdoor exercise. But the court is simply unable to find that that deprivation "imposes atypical and significance hardship on the inmate in relation to the ordinary incidents of prison life." *See id.* —— – ——, 115 S.Ct. at 2304; *see also Hunter v. Gomez*, 95–15208, 1995 WL 392572, * 1, 1995 U.S. App. LEXIS 16236, at * 2 (9th Cir. June 30, 1995) (relying upon *Sandin*, the Court refused to find that inmates had a constitutionally protected liberty interest in yard access when they complained of restricted yard access because of their assigned work status). Nor is the court able to find that because plaintiff did not receive two meals out-of-cell per day between February 12, 1987 and March 16, 1987, he was subjected to an "atypical and significant hardship" so as to implicate the Due Process Clause. Third, even though plaintiff did not receive a total of three hours out-of-cell time per day between February 12, 1987, and March 16, 1987, the court also finds that such deprivation did not result in an "atypical and significant hardship" within the meaning of *Sandin*. Finally, the court is not persuaded that even if plaintiff was, on a few occasions, taken to the yard via the general population, and also required to re-create with those inmates, that those actions rise to the level of an "atypical and significant hardship" under *Sandin*.

■ Admittedly, between February 12, 1987, and July 25, 1987, plaintiff Cody did not **always** receive **all** of the conditions of confinement for protective custody inmates, which Directive 4948 identifies; but, when the whole picture is examined, the court cannot find that his conditions of confinement during that time "present a dramatic departure from the basic conditions" of his sentence. *See Sandin*, —— U.S. at ——, 115 S.Ct. at 2301. Furthermore, as in *Sandin*, nothing in the State's actions affected the duration of Cody's sentence. In short, the particular deprivations at issue in this case, in the court's view, did not "impose[ ] atypical and significant hardship on [plaintiff Cody] in relation to the ordinary incidents of prison life." *See id.* at —— – ——, 115 S.Ct. at 2304. Accordingly, plaintiff Cody does not have a liberty interest in DOC identified conditions of confinement for a protective custody status inmates such as would entitle him to invoke the Fourteenth Amendment's Due Process Clause.

■ The court has one final observation before turning to plaintiff's Eighth Amendment claim, and that is that given the undeniably broad language of *Sandin*, the court is not convinced, as plaintiff Cody seems to be urging, that *Sandin* is limited to cases where a plaintiff inmate is challenging some disciplinary action taken against him. Indeed, in the short time since *Sandin* was decided, courts have relied upon *Sandin* to find that deprivation of the ability to participate in a furlough program is not an "atypical and significant hardship," *see Briggs v. Fields*, 94–6400, 1995 WL 422858 (10th Cir. July 19, 1995); and to find that a prison headgear restriction also is "not atypical" of prison life. *See Muslim v. Frame*, 891 F.Supp. 226 (E.D.Pa.1995). Neither *Briggs* nor *Muslim* were disciplinary action cases. What is more, it seems to this court that if the Supreme Court intended to limit the impact of *Sandin* to disciplinary cases, it could easily have done so, but it did not. Therefore, although the court is fully cognizant that plaintiff Cody was not disciplined while at Great Meadow, in the court's opinion, that fact, does not render *Sandin* inapplicable.

442

## II. Eighth Amendment

■ The court assumes for the sake of argument that plaintiff's claim that he was deprived of one hour daily exercise between February 12, 1987, and March 16, 1987, rises to the level of a constitutional deprivation based upon the Eighth Amendment. *See Miles v. Bell,* 621 F.Supp. 51, 63 (D.Conn. 1985) ("Many courts have recognized a constitutional right to physical exercise.") (and cases referenced therein.). Nevertheless, plaintiff Cody still cannot prevail on this claim because the record clearly establishes that the only remaining defendant, Everett Jones, a supervisory defendant, had no personal involvement in the alleged constitutional deprivation, which is a prerequisite to an award of damages under section 1983. *See Colon v. Coughlin,* 58 F.3d 865, (2nd Cir. 1995) (citations omitted). There is simply no evidence in the record that defendant Jones had requisite personal involvement based upon any of the five ways which the Second Circuit has recognized time and again as forming the basis for supervisory liability under section 1983. *See id.* at 873. Consequently, plaintiff's Eighth Amendment claims also fails.

Given the court's determinations that plaintiff's Fourteenth and Eighth Amendment claims are without merit, obviously there is no need for the court to consider defendant Jones's qualified immunity defense.

For the reasons set forth herein, the court hereby finds in favor of the defendant, Everett Jones, and against the plaintiff, William Cody, and hereby dismisses the complaint in its entirety. The Clerk of the Court is directed to enter judgment in accordance with this decision.

IT IS SO ORDERED.