Rick L. WILSON, Plaintiff,

v.

Charles HARPER and Ronald Welder, Defendants.

Civil No. 4–94–70620.

United States District Court,
S.D. Iowa,
Central Division.

Nov. 14, 1996.

Philip B. Mears, Mears Law Office, Iowa City, IA, for plaintiff.

Kristin W. Ensign, Attorney General of Iowa, Des Moines, IA, for defendants.

**ORDER ACCEPTING REPORT AND RECOMMENDATION AND ORDER OF DISMISSAL**

VIETOR, District Judge.

Plaintiff brought this action pursuant to 42 U.S.C. § 1983. Jurisdiction of the court is predicated on 28 U.S.C. § 1343.

On June 5, 1995, this case was referred to United States Magistrate Judge Ross A. Walters, pursuant to 28 U.S.C. § 636(b)(1)(B), for further proceedings. On July 2, 1996, Magistrate Judge Walters filed a report and recommendation in which he recommends that judgment be entered in favor of defendants and that plaintiff's complaint be dismissed. The parties were granted to and including July 17, 1996, within which to file objections. Plaintiff requested and received several extensions of time within which to file objections. Plaintiff has filed objections to the report and recommendation.

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.

28 U.S.C. § 636(b)(1).

I have made the required de novo review of the record, and I accept the report and recommendation of the Magistrate Judge.

**IT IS ORDERED** that judgment be entered in favor of defendants and that plaintiff's complaint is **DISMISSED.**

**REPORT AND RECOMMENDATION**

WALTERS, United States Magistrate Judge.

Plaintiff, Rick Wilson, an inmate at the Iowa State Penitentiary ("ISP") in Fort Madison, Iowa brought this action against Defendants on September 28, 1994 asserting claims for relief under 42 U.S.C. § 1983. In his complaint Plaintiff alleges Defendants violated his Fourteenth Amendment right to due process of law in connection with prison disciplinary proceedings in September of 1992. On August 3, 1995 Defendants filed a motion for judgment on the pleadings. The Court denied Defendants' motion on August 29, 1995. Plaintiff seeks monetary damages for the alleged constitutional violation. Defendants deny Plaintiff states a claim for relief under current due process standards and, in any event assert they are entitled to qualified immunity for their conduct.

Jurisdiction is predicated on 28 U.S.C. sections 1331, 1343(a)(3), and 1343(a)(4). This matter was referred to the undersigned on June 5, 1995 for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The case came on for evidentiary hearing in Fort Madison on October 11, 1995. Plaintiff was represented by Iowa City attorney Philip Mears. Defendants were represented by Assistant Iowa Attorney General Kristin Ensign.

At the start of the hearing Defendants stipulated there was no evidence to support the disciplinary action against Plaintiff and that the issues were whether Plaintiff was entitled to the protections of procedural due process in light of the Supreme Court's 1995 decision in *Sandin v. Conner* and the amount of Plaintiff's damages. Evidentiary Hearing Tr., at 3–5. Evidence was then presented on these issues.

The parties filed post-trial briefs and the case is fully submitted. Upon careful consideration of the evidence presented at the evidentiary hearing, the arguments and statements of counsel and their written submissions, the Court finds and recommends as follows on the issues presented.

## FINDINGS OF FACT

Plaintiff Rick Wilson was housed in the general prison population ("GP") at ISP in early 1992. He is serving a life sentence. Defendants were at all times pertinent to this litigation staff members at ISP. Defendant Charles Harper is an Iowa Administrative Law Judge and defendant Ronald Welder is an Executive Assistant to the Warden at ISP.

Between 1986 and 1992 Wilson had been charged with only one major discipline report and approximately five minor reports. Tr., at 18; Exhibit 3. Wilson had not previously been sanctioned with disciplinary segregation time in connection with any report. Tr., at 18. In April 1992 Wilson earned a transfer from GP status to Honor Lifer ("HL") status and he was placed on the HL unit in cellhouse 318. *Id.* at 18. Prior to this transfer he had been on the HL waiting list for approximately one year. *Id.*

The HL unit consists of forty-two cells in an upper section of cellhouse 318. *Id.* at 19–20. To be eligible for HL status an inmate serving a life sentence must first have served three years of his sentence at ISP. Exhibit A, at 2–3. He must be free of a major discipline report (or a number of minor reports) for three years prior to application for HL status. *Id.* at 3. The inmate must also have had outstanding work and cellhouse reports and completed all recommended programming. *Id.* HL status generally entitles an inmate to additional privileges and personal property items. *See generally* Exhibits A; 5.

HL inmates are permitted to be out of their cells on the ranges within the HL unit between approximately 6:00 a.m. and 7:00 p.m. on Mondays through Thursdays. Exhibit A, at 6. Tables and chairs are set up along the ranges where HL inmates may meet and talk or play cards and the like. On Friday, Saturday, and Sunday nights HL inmates may be out of their cells until approximately 9:00 p.m. *Id.* at 5–6. The showers may be used in the HL unit during any period when inmates are out of their cells. *Id.* at 6. Inmates may not go into other inmate's cells. *Id.* In comparison, GP inmates are only out of their cells at times scheduled for meals, yard periods, religious services, and visitation.

GP inmates are permitted two hours each day of the week for yard (recreation) time. During yard periods GP inmates may exercise outside in the big yard or in the gymnasium, go to the library or hobby craft area, and make personal (collect) telephone calls. HL inmates have the same length of time for yard during the week as GP inmates, but an additional four hours each day on the weekends. Exhibit A, at 6; Tr., at 89–90. Inmates in the HL unit have access to a telephone which may be used in their cells from 10:00 a.m. until evening lockup. *Id.* at 4. A washer and dryer and an ice machine are also available in the HL unit. *Id.* at 5–6.

GP inmates may only work on hobby craft projects during yard time in the hobby craft area. An HL inmate may perform hobby craft work in his cell during any period when he is permitted to be outside of the cell.

Exhibit A, at 4. Some hobby craft tools may be kept in the cell, while other tools are stored in the cellhouse office and checked out to the inmate during the day. *Id.* Wilson testified hobby craft was very important to him and he performed leather work approximately thirty hours per week while on the HL unit. Tr., at 27–30.

With the exception of cellhouse 220, which houses inmates in the highest level of protective custody and some disciplinary detention, administrative segregation and close management inmates, all of the cells at ISP are the same size and include essentially the same furnishings (bed, toilet, sink, table, and chair). Beds in the HL unit are spring beds rather than solid beds allowing for storage underneath the bed. Exhibit A, at 5. HL inmates are allowed one additional footlocker in their cells. *Id.* at 4. As between GP and HL inmates, HL's are allowed to possess ten extra books or magazines (35 total), twenty-five cassette tapes (none in GP), one extra photo album (3 total), certain sports equipment, and additional personal hygiene and clothing items. *Id.* at 4–6; Exhibit 5, Enc. A, at 1–9. Wilson testified he took advantage of the HL privileges and increased property allowances. Tr., at 27.

There appears to be no significant difference between GP and HL inmates as to educational opportunities, access to religious services, mail privileges, canteen rules, library access, health services, or visitation privileges.[1] Likewise, all inmates except those in lockup status are eligible for prison jobs. Those who work may earn work bonus credit off of their sentence. *See* Exhibit 7. Work bonus credit appears to be similar to credit earned for good conduct.[2] Before June of 1992 Wilson worked five hours in the maintenance shop on weekday mornings. He earned approximately $21.60 per month. Tr., at 21.

On June 24, 1992, Wilson was placed in investigative segregation status and moved to cellhouse 319 based on his suspected involvement in a prison escape plan. Following an investigation Wilson received a disciplinary notice on August 25, 1992 charging him with violation of five prison rules in connection with the alleged escape plan. Exhibit 1, at 2–3. Hearing before a disciplinary committee was held on September 25. *Id.* at 16–17. Defendant Harper was chair of the committee. Relying on information supplied by a confidential informant defendant Harper and the other committee members found Wilson guilty of violating Rule 41 based on his alleged complicity in supplying a saw and a drill with bits for the escape plan. *Id.* The disciplinary committee sanctioned Wilson to thirty days disciplinary detention, loss of 365 days good-time credit, and one year cell restriction to a maximum security cellhouse. *Id.* at 1, 16–17.

Wilson filed an appeal of the decision the same day. Exhibit 1, at 18–20. Defendant Welder denied the appeal on October 2, 1992. *Id.* at 21. Debbie Nichols, an ISP administrative officer, denied Wilson's supplemental appeal on October 12. *Id.* at 22–25. Wilson then filed an application for postconviction relief in state court. Before hearing was held on his application the State moved to dismiss the proceeding and agreed to expunge Wilson's disciplinary record and to return all of the good-time credits taken. *See* Exhibit 6. The Iowa District Court dismissed the postconviction matter on May 3, 1994.[3] *Id.* All of Wilson's good time credit has been restored and pursuant to ISP policy Wilson also received 90 days of back pay. Tr., at 66–67.

Wilson spent approximately three months in investigative segregation status in cellhouse 319 before he was found guilty of violating Rule 41.[4] Investigative segregation is one form of administrative segregation and

---

1. After one year on the HL unit an inmate may request a private social visit in the attorney room once a year. Exhibit A, at 6.

2. For an inmate serving a life sentence credit for good-time and work bonus time is only meaningful in the event the sentence is later commuted to a term of years.

3. At this point Wilson had already served the disciplinary detention and cell restriction time.

4. Wilson remained in cellhouse 319 during the entire period of disciplinary segregation.

is a nonpunitive status. *See generally* Exhibit 5, Enc. A, at 1–9. In general, the conditions of confinement in investigative and punitive administrative segregation are governed by a settlement agreement in *Gavin v. Ray*, Civil No. 78–62–2 (S.D.Iowa 1984). During this period Wilson testified he was permitted to have his television, radio, ten books or magazines,[5] and tobacco in his cell. Tr., at 43. He did not have a tape player or cassettes in segregation and his personal telephone calls were limited to two per month. Wilson could not perform hobby craft work in his cell or during yard time while in segregation.

In general, segregated inmates are not permitted to work.[6] Wilson was, however, paid $7.70 per month idle pay. Tr., at 22. Wilson testified the cellhouse was noisy most of the time and it was dirty. *Id.* at 35–36. Yard time for inmates in administrative segregation is limited to one hour per day five days a week in a fenced approximately eight by thirty foot enclosure. The only equipment in the enclosure is an exercise bar and there is not much to do beyond simple exercises.[7] The remainder of the time segregated inmates are locked in their cells. Meals are served in the cells. Wilson indicated he was not interested in any educational opportunities he may have missed while segregated. In segregation library books may be obtained upon request. Counselors are available to meet with inmates and access to mail, health services, and visitation privileges are the same for segregated inmates as the GP.

Wilson next served thirty days in disciplinary detention status. He had the same limited opportunity for exercise as in administrative segregation. The privileges and personal property are more limited in disciplinary detention in certain particulars, and in other ways are the same. *See* Exhibit 5, Enc. A, at 1–9. Wilson did not have a television or radio in his cell and he was not permitted to have tobacco products or to smoke. Wilson testified because he had smoked a pack and a half of cigarettes per day, this restriction was very hard on him physically and mentally.[8] Tr., at 38. His canteen privileges and book allowance were more limited than in investigative status. Personal telephone calls are not permitted in detention status. Wilson did have the same access to a counselor, health services, mail, library books, and visitation as in administrative segregation. Time in disciplinary detention is served in ten day periods—ten days in, one day out, ten days in, and so on to conclusion. Tr., at 32.

Upon completion of the detention time Wilson began serving the one year cell restriction sanction. "Administrative segregation" is an "umbrella" term at ISP which covers all types of restrictions, including investigative segregation and cell restriction. Tr., at 80–81. Wilson's privileges and property rights were the same in cell restriction status as they had been during the period he spent in investigative segregation. Tr., at 42–43. While under cell restriction Wilson met with a classification review committee approximately every seven days from November 4, 1992 through March 12, 1993. *See* Exhibit 4, at 1–9. The committee notes reflect he was meeting all expectations and was recommended for time cuts on his discipline sentence in December, January, February, and March. *Id.* Wilson did not express any problems or concerns to the committee.

On March 16, 1993, the classification committee recommended Wilson be placed in close management status; his status was changed as of April 17. Exhibit 4, at 10–12. Close management status consists of level A and level B and in Wilson's case was a nonpunitive form of administrative segregation preparatory to placement back in the general population. Wilson testified level A did not significantly differ from cell restriction status except that he was moved to another range

---

5. The Court notes the current ISP policy reflects that segregated inmates may possess twenty-five books or magazines. Exhibit 5, Enc. A, at 6.

6. Thus, they cannot earn work bonus credit in segregation status.

7. Activities such as hobby crafts available to GP inmates during yard time are not available to segregated inmates.

8. Smoking is no longer permitted in individual cells at ISP.

in the same cellhouse and he was allowed to have a fan and bring coffee into his cell. Tr., at 40. Between April 27 and May 25 Wilson met with the classification committee approximately every seven days and received satisfactory reviews. Exhibit 4, at 14–18. Wilson did not express any problems or concerns to the committee.

On May 25, 1993, the classification committee recommended Wilson be elevated to close management level B status and be allowed to move outside the unit without leg restraints. Exhibit 4, at 18. Wilson testified in level B segregation he was permitted two hours of yard time on weekdays in the big yard, and to have soda pop in his cell. Tr., at 44–45. Close management yard time was separate from GP yard periods. *Id.* In all other respects his privileges and property rights remained the same. Wilson's status was reviewed twice in June and once in July and in August. Exhibit 4, at 19–22. He did not express any problems or concerns to the committee.

The classification committee recommended Wilson be moved from close management status and returned to the general population at level 1 on September 7, 1993. Exhibit 4, at 23. He was then transferred to the GP on September 13, and returned to all GP privileges and · property rights consistent with level 1 status. At that time level 1 inmates were not permitted to possess cassette tapes. Tr., at 47. John Emmett testified level 1 inmates are permitted two hours of yard time seven days a week. Tr., at 90.[9] Wilson remained at GP level 1 until he was charged with a major report in September 1994. Exhibit 3, at 1. That report was suspended and he did not spend any time in disciplinary segregation. Tr., at 48. Although Wilson's disciplinary record was expunged in May 1994 he has not qualified for return to HL status and remains at level 1 in the GP. *Id.* at 52.

Wilson testified that because he had not previously been placed in disciplinary segre-

gation status he experienced much stress and had trouble eating and sleeping primarily during the initial period of investigative segregation. Tr., at 49–50. Wilson found it harder to sleep in cellhouse 318 because it was much noisier than the HL unit. He estimates he lost between ten and fifteen pounds. *Id.* at 52. Wilson also stated being without a job for over a year and without the ability to perform hobby craft was hard on him mentally and financially. *Id.* at 50–52. He testified he had to sell his hobby craft tools and to date has not been able to purchase new tools. *Id.* at 51–52. On cross-examination Wilson indicated he had not sought counseling or medical attention for any physical or emotional problems and he has suffered no long-term health effects. *Id.* at 66.

### DISCUSSION

#### I. *Due Process.*

■ Before *Sandin v. Conner*, —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), there would have been no question that Wilson suffered a due process violation in connection with his prison discipline.[10] One of the rudiments of due process in the prison disciplinary context is that a disciplinary decision must be supported by "some evidence" in the record. *Superintendent, Massachusetts Correctional Inst. v. Hill*, 472 U.S. 445, 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356, 365 (1985); *see also Goff v. Dailey*, 991 F.2d 1437, 1440 (8th Cir.1993), *cert. denied*, 510 U.S. 997, 114 S.Ct. 564, 126 L.Ed.2d 464 (1993); *Brown–El v. Delo*, 969 F.2d 644, 647 (8th Cir.1992); *Ryan v. Sargent*, 969 F.2d 638, 640 (8th Cir.1992), *cert. denied*, 506 U.S. 1061, 113 S.Ct. 1000, 122 L.Ed.2d 150 (1993). Confidential information may fit the bill, but certain procedural protections are required to allow an assessment of the reliability of the information. *See Freitas v. Auger*, 837 F.2d 806, 810 n. 8 (8th Cir.1988); *accord Whitford v. Boglino*, 63 F.3d 527, 535–36 (7th

---

9. At GP level 2 inmates are allowed one extra hour of yard time on weekends and at level 3 they are allowed two extra hours on the weekends. Tr., at 89–90.

10. It is undisputed that if Iowa prison officials could create a liberty interest in freedom from the type of punishment imposed on Wilson, prison regulations are sufficiently mandatory to have done so.

Cir.1995); *Ryan*, 969 F.2d at 640; *Orebaugh v. Caspari*, 910 F.2d 526, 528 (8th Cir.1990). Defendants concede there was no evidence to support the disciplinary decision.[11]

The question before and after *Sandin* is whether the inmate has a liberty interest in remaining free from the punishment imposed. *Sandin* re-examined the inquiry a court must make in determining the presence of a liberty interest. There an inmate, DeMont Conner, filed a section 1983 action alleging a violation of his procedural due process rights after a prison disciplinary committee had denied his request to present witnesses at a disciplinary hearing. *Sandin*, — U.S. at —, 115 S.Ct. at 2296, 132 L.Ed.2d at 424. Conner sought equitable relief as well as damages for the deprivation of procedural due process. A disciplinary committee had found Conner guilty of the charged misconduct and sentenced him to thirty days in disciplinary segregation. *Id.* at —, 115 S.Ct. at 2296, 132 L.Ed.2d at 424. He sought administrative review of the decision and his disciplinary record was ultimately expunged. *Id.* at —, 115 S.Ct. at 2296, 132 L.Ed.2d at 424.

On appeal from the district court's rejection of his claim, Conner successfully argued he had a liberty interest in remaining free from punitive segregation. *Id.* at — — —, 115 S.Ct. at 2296–97, 132 L.Ed.2d at 424–26. The Supreme Court reversed the Ninth Circuit's decision abandoning the framework under which courts had analyzed the actual language of state prison regulations rather than the nature of the deprivation or restraint itself. *Id.* at — — —, 115 S.Ct. at 2298–2300, 132 L.Ed.2d at 426–30; *see Patchette v. Nix*, 952 F.2d 158, 161–62 (8th Cir.1991); *Taylor v. Armontrout*, 894 F.2d 961, 963 (8th Cir.1989). The Court observed this analysis "encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." *Sandin*, — U.S. at —, 115 S.Ct. at 2299, 132 L.Ed.2d at 428. The Court then announced it was returning to the due process principles set forth and applied in *Wolff v. McDonnell* and *Meachum v. Fano*. It indicated a liberty interest, and hence a right to the protection of procedural due process, can arise in two situations. First, such an interest is implicated when an inmate is placed in a restraint which

> while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

— U.S. at —, 115 S.Ct. at 2300, 132 L.Ed.2d at 430 (internal citations omitted). Second, a liberty interest is involved when the punishment includes action which "necessarily affects the duration of a prisoner's sentence." *Moorman v. Thalacker*, 83 F.3d 970, 973 (8th Cir.1996); *see Sandin*, — U.S. at —, 115 S.Ct. at 2297, 132 L.Ed.2d at 425. *Sandin* applies retroactively. *Mujahid v. Meyer*, 59 F.3d 931, 932 n. 2 (9th Cir.1995) (citing *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 95, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74, 85 (1993)).

Wilson's right to due process procedures depends solely on whether the restraint placed on him as a result of the disciplinary action imposed an "atypical and significant hardship." Though the disciplinary committee took a year of good time from Wilson, this branch of the liberty interest inquiry is not pertinent here. The Eighth Circuit has recently observed that, because of its apparently discretionary nature, it is "unclear that Iowa's statutory scheme creates a liberty interest in good time." *Moorman*, 83 F.3d at 973. Even if it does, however, the fact is

---

11. The disciplinary committee found Wilson had provided a drill with bits and a saw in connection with a prison escape plan. Exhibit 1, at 16. Wilson apparently had access to such items in his prison job. *Id.* The committee's decision also reflects it based its decision on confidential information which it found reliable. *Id.* There is no indication in this record as to what that information was or what happened to it. In his pro se complaint Wilson alleged Defendants lost the confidential information and this led to the settlement of the state postconviction litigation resulting in expungement of the disciplinary action and restoration of good time. Complaint, at 3–4. In any event, the stipulation in this case is that there was no evidence to support the disciplinary action.

Wilson is serving a life sentence and no discharge or parole is possible unless the governor commutes it. Iowa Code §§ 902.1; 914.1. It is thus speculative, indeed doubtful, any loss of good time could affect the duration of his sentence. Moreover, in the end Wilson did not lose any good time.[12] It has been restored to him without harm resulting from its temporary deprivation. *See Muhannad v. Kinney*, 51 F.3d 762, 763–64 (8th Cir.1995); *Harper v. Lee*, 938 F.2d 104, 105 (8th Cir.1991).

■ Wilson's displacement from the privileged status of an honor lifer to the stricter conditions of disciplinary detention and cell restriction undoubtedly was a hardship to him and atypical in his personal experience in the prison. However, an inmate's "subjective expectations [are not] dispositive of the liberty interest analysis." *Sandin*, —— U.S. at —— n. 9, 115 S.Ct. at 2301 n. 9, 132 L.Ed.2d at 431 n. 9. Rather, the *Sandin* standard invokes a comparison of the punitive restraint with what an inmate can expect from prison life generally to determine whether there has resulted an "atypical, significant deprivation," *Williams v. Ramos*, 71 F.3d 1246, 1249 (7th Cir.1995), which presents "dramatic departures from the basic conditions and ordinary incidents of prison sentences." *Moorman*, 83 F.3d at 972.

■ Wilson's punitive confinement had two components—cell restriction and disciplinary detention. In *Sandin* the Supreme Court found Conner's thirty days of disciplinary segregation did not implicate a liberty interest in part because the conditions, with "insignificant exceptions," mirrored the conditions imposed on inmates in the discretionary confinement of administrative segregation and protective custody. *Sandin*, —— U.S. at ——, 115 S.Ct. at 2301, 132 L.Ed.2d at 430. Thus, ordinarily no liberty interest will arise where the nature of punitive segregation does not materially differ ·from the conditions of nonpunitive administrative segregation. *See Williams*, 71 F.3d at 1249–50; *Bruns v. Halford*, 913 F.Supp. 1295, 1303–04 (N.D.Iowa 1996). That is the case here with respect to Wilson's cell restriction. Cell restriction is a form of administrative segregation. The conditions were, as far as the record indicates, the same or similar to the conditions of other, discretionary forms of administrative segregation such as the investigative segregation and close management which preceded and followed his time in cell restriction.

It is appropriate nonetheless to compare Wilson's cell restriction in administrative segregation with conditions in the general population. Wilson's opportunity for yard activities was limited as indicated. His yard privileges were correspondingly less. He was limited to two personal phone calls per month. He could not have a prison job. The property Wilson could have in his cell was more limited, but not significantly so.[13] Indeed, in his testimony Wilson did not complain about the property allowance in administrative segregation. These differences, consisting principally of loss of privileges rather in the conditions of confinement, are not in the Court's judgment so dramatic as to

---

**12.** To the extent Plaintiff is arguing that a liberty interest arises in any discipline situation where the loss of good conduct time is a potential punishment, the Court believes *Sandin* cannot be interpreted to extend this far. The Supreme Court specifically noted the situation did not "present a case where the State's action will inevitably affect the duration of [plaintiff's] sentence." *Sandin*, —— U.S. at ——, 115 S.Ct. at 2302, 132 L.Ed.2d at 431. The Court explained the parole board's decision involved consideration of a number of factors and was not dictated by the presence or absence of a misconduct record in an inmate's file. *Id.*, —— U.S. at ——, 115 S.Ct. at 2302, 132 L.Ed.2d at 431. *Compare Bruns v. Halford*, 913 F.Supp. 1295, 1303–04 (N.D.Iowa 1996) (length of sentence not affected by discipline) *and Stone–Bey v. Barnes*, 913 F.Supp. 1226, 1234–36 (N.D.Ind.1996) (sanction of disciplinary segregation will not "inevitably" affect chances of parole) *with Gotcher v. Wood*, 66 F.3d 1097, 1100–01 (9th Cir.1995) (thirty days lost); *Reynolds v. Wolff*, 916 F.Supp. 1018, 1023 (D.Nev.1996) (credits revoked) *and Nelson v. McBride*, 912 F.Supp. 403, 406 (N.D.Ind.1996) (loss of ninety days of good time will affect duration of sentence).

**13.** Wilson could have the property allowed to administrative segregation inmates. Such inmates may have in their cells most items allowed to GP inmates except sports equipment, small appliances such as a coffeepot or fan, a tape player, musical instruments, a typewriter, and a number of personal hygiene and clothing items. Exhibit 5 (personal property listing).

allow Wilson's cell restriction to be categorized as an atypical and significant deprivation.[14] The conditions he experienced were typical of administrative segregation at ISP and "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration," *Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 869–70, 74 L.Ed.2d 675, 686 (1983), particularly in the case of a life prisoner.[15]

In the wake of *Sandin* most courts have concluded that "administrative segregation, without more, does not constitute a deprivation of a constitutionally cognizable liberty interest." *Luken v. Scott,* 71 F.3d 192, 193 (5th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1690, 134 L.Ed.2d 791 (1996); *see also Pichardo v. Kinker,* 73 F.3d 612, 613 (5th Cir.1996); *Rimmer–Bey v. Brown,* 62 F.3d 789, 791 (6th Cir.1995); *Bruns v. Halford,* 913 F.Supp. 1295, 1302–03 (N.D.Iowa 1996); *Oswalt v. Godinez,* 894 F.Supp. 1181, 1185–86 (N.D.Ill.1995); *Scales v. Dist. of Columbia,* 894 F.Supp. 14, 16–17 (D.D.C.1995). If there is a "more" here, it is the additional thirty days of disciplinary detention.[16]

The conditions in administrative segregation and disciplinary detention are similar in many respects. The yard time, such as it is, is the same for both. The cell is the same with the same furnishings. Access to religious and health services, mail and books from the library is essentially the same as is the opportunity for visitation. The food is the same and is served in the same manner. In either status, the inmate has some canteen privileges, though somewhat less for inmates in disciplinary detention, the extent of which does not appear in the record. The principal differences identified by Wilson are the inability to make personal telephone calls in disciplinary detention, and most significantly to Wilson, the inability to have a TV, radio, or cigarettes. This comports with ISP Security Director John Emmett's testimony that "the biggest restriction is no television set and no smoking." Tr., at 80. There are some additional restrictions. The number of books and magazines allowed to a disciplinary detention inmate is about half that permitted to a GP or administrative segregation inmate, and disciplinary detention inmates are not permitted to have board games, playing cards, and the like. Beyond this, the personal property items allowed to inmates in disciplinary detention are similar to what is allowed to administrative segregation inmates. *See* Exhibit 5 (personal property listing). The maximum period of disciplinary detention allowed for an incident is thirty days.

As can be seen the distinguishing feature of disciplinary detention is the comparative lack of in-cell amenities. These are important to a prisoner, that is why it is punishment to take them away. The Court does not believe, however, a thirty-day deprivation of TV, radio, games, personal phone calls and cigarettes can fairly or accurately be described as an atypical, significant deprivation representing a dramatic departure from the basic conditions and ordinary incidents of prison life. "Generally, revocation of privileges is within the expected scope of a prison sentence" and the denial of the privileges which characterizes disciplinary detention at

---

**14.** By focusing on a comparison between nonpunitive and punitive segregation the *Sandin* court effectively did away with any determinative significance the categorization of the confinement as punitive might formerly have had. The issue is the degree and duration of the restraint in relation to the ordinary incidents of prison life. *Sandin,* — U.S. at —, 115 S.Ct. at 2301, 132 L.Ed.2d at 430; *Bruns,* 913 F.Supp. at 1303 & n. 3.

**15.** The general parameters of the conditions and privileges allowed to Wilson while in cell restriction are derived from the negotiated settlement agreement in *Gavin v. Ray.* That agreement reflects a balancing of the purposes and logistical and security requirements of administrative segregation with the interest of inmates in avoiding undue hardship. With this history it would be difficult to conclude administrative segregation at ISP is an atypical deprivation when compared with general prison life at the penitentiary. To the contrary, it is a common type of incarceration with deprivations no more extreme than those consistent with its purposes.

**16.** Wilson had no constitutional right to maintain honor lifer status or in his prison job. *See Hewitt,* 459 U.S. at 467–68, 103 S.Ct. at 869–70, 74 L.Ed.2d at 685–86; *Moorman,* 83 F.3d at 973; *Flittie v. Solem,* 827 F.2d 276, 279 (8th Cir.1987). Transfers in and out of confinement categories and prison jobs for various reasons are an ordinary part of prison life.

ISP is neither unusual nor remarkable in its hardship. *Whitford*, 63 F.3d at 533 n. 7. Further, Wilson's confinement in disciplinary detention appears to be similar to inmate Conner's disciplinary segregation in *Sandin*. *Sandin*, —— U.S. at ——, 115 S.Ct. at 2305, 132 L.Ed.2d at 435 (Breyer, J., dissenting); *see also Moorman*, 83 F.3d at 970.

It is appropriate to consider the duration of the restriction as well as its degree. Courts have found there is no liberty interest in remaining free from brief periods of disciplinary segregation. *See Frazier v. Coughlin*, 81 F.3d 313, 317–18 (2d Cir.1996) (twelve days in segregation unit); *Williams*, 71 F.3d at 1249–50 (nineteen days in closed cell); *Walker v. Mahoney*, 915 F.Supp. 548, 553–54 (E.D.N.Y.1996) (twenty-three days in segregation); *Bruns*, 913 F.Supp. at 1303–04 (ninety days in segregation); *Schmelzer v. Norfleet*, 903 F.Supp. 632, 634–35 (S.D.N.Y. 1995) (eleven day confinement in "keeplock"); *Kirsch v. Franklin*, 897 F.Supp. 1173, 1177–78 (E.D.Wis.1995) (thirteen days in disciplinary segregation); *Cody v. Jones*, 895 F.Supp. 431, 441 (N.D.N.Y.1995) (approximately five months of restricted out-of-cell time); *Winfrey v. Ultsch*, 895 F.Supp. 229, 231 (E.D.Wis.1995) (apparent four months in disciplinary segregation). It has even been suggested that the dismissal of cases involving disciplinary segregation of thirty days or less in its usual form should be as a matter of course. *See Bonner v. Parke*, 918 F.Supp. 1264, 1270 (N.D.Ind.1996).

Wilson was in punitive administrative segregation for nearly six additional months. Including his time in investigative segregation and close management, he was confined under administrative segregation-type conditions for a total of about eleven months. There is no evidence in the record, however, which would permit the Court to conclude these periods of time are significantly atypical at ISP in relation to other types of discretionary segregation under similar conditions. Here again, the post-*Sandin* case law generally supports the conclusion that the duration

of Wilson's cell restriction does not permit the finding of a liberty interest. *See Whitford*, 63 F.3d at 533 (six months not extreme); *Bonner*, 918 F.Supp. at 1270 (three years segregation does not invoke liberty interest); *Stone–Bey v. Barnes*, 913 F.Supp. 1226, 1234–35 (N.D.Ind.1996) (one year insufficient); *Delaney v. Selsky*, 899 F.Supp. 923, 927 (N.D.N.Y.1995) (197 extra days not significant); *Carter v. Carriero*, 905 F.Supp. 99, 104 (W.D.N.Y.1995) (270 days did not exceed duration or degree of restraint in similar administrative segregation).[17]  Though the conditions were not indicated, the Eighth Circuit in *Moorman* did not think that 122 days of disciplinary detention served by the Iowa Men's Reformatory inmate in that case, including fifteen days at the "highest level of disciplinary detention," were "a dramatic departure from the ordinary incidents of prison life." *Moorman*, 83 F.3d at 973.[18]

■  The Court has reached its conclusion in this case reluctantly because Wilson has suffered a wrong for which he formerly had a remedy under well-established principles of due process.  There is, however, no escaping the impact of *Sandin*.  It greatly constricts the applicability of the Due Process Clause in prison disciplinary proceedings.  The liberty interest in freedom from "atypical and significant hardship" is limited to the unusual case and will not often be present with respect to the familiar, commonly employed forms of disciplinary confinement to which courts, and prisoners, are accustomed.  As the Fifth Circuit plainly put it, in light of *Sandin*

> [I]t is difficult to see that any other deprivations in the prison context, short of those that clearly impinge on the duration of confinement, will henceforth qualify for constitutional "liberty" status.

*Orellana v. Kyle*, 65 F.3d 29, 31–32 (5th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996).  *Sandin* requires the dismissal of Wilson's section 1983 action for damages.

---

**17.** *But see Williams v. Fountain*, 77 F.3d 372, 374 n. 3 (11th Cir.1996) (assuming 1 year of solitary confinement meets *Sandin* standards).

**18.** The inmate plaintiff bears the burden of establishing a liberty interest. *Sandin*, —— U.S. at ————, 115 S.Ct. at 2300–01, 132 L.Ed.2d at 429–31; *see, e.g., Kirsch*, 897 F.Supp. at 1177–78; *Delaney*, 899 F.Supp. at 927–28.

**724**

## II. *Qualified Immunity.*

 Left for the Court to consider is Defendants' claim they are entitled to qualified immunity for their actions. Defendants raised the defense of qualified immunity in their answer to the complaint and again in their post-trial brief. Qualified good faith immunity is an affirmative defense which protects prison officials from individual liability for civil damages. *Mahers v. Harper,* 12 F.3d 783, 785 (8th Cir.1993). Prison officials are entitled to qualified immunity " 'if, at the time of the challenged acts, it was not clearly established that those actions would violate clearly established law of which a reasonable person would have known.' " *Latimore v. Widseth,* 7 F.3d 709, 712 (8th Cir.1993), *cert. denied,* 510 U.S. 1140, 114 S.Ct. 1124, 127 L.Ed.2d 433 (1994) (quoting *Jackson v. Rapps,* 947 F.2d 332, 338 (8th Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992)); *see also Brown v. Frey,* 889 F.2d 159, 165 (8th Cir.1989), *cert. denied,* 493 U.S. 1088, 110 S.Ct. 1156, 107 L.Ed.2d 1059 (1990).

"The qualified immunity inquiry involves a two-step process." *Munz v. Michael,* 28 F.3d 795, 799 (8th Cir.1994). First, the plaintiff must allege violation of a clearly established constitutional right. Second, the Court "must determine whether that constitutional right was clearly established at the time that the officials acted." *Id.* Having concluded Wilson has failed to establish constitutional violation, the Court will only briefly address the second part of the inquiry.[19]

Defendants have conceded the disciplinary decision was not supported by "some evidence." This is a long-established, elementary requirement of due process of which Defendants must have been aware. Defendants are experienced in the determination and review of prison disciplinary cases. They did not testify at the evidentiary hearing. The Court infers from this they well understood due process required some evidence to support the disciplinary action. Had Wilson established a liberty interest in being free of

the particular form of disciplinary sanction imposed, Defendants would not be immune from damages.

### RECOMMENDATION

IT IS RESPECTFULLY RECOMMENDED, pursuant to 28 U.S.C. § 636(b)(1)(B), that judgment be entered in favor of Defendants and that Plaintiff's complaint be dismissed.

IT IS ORDERED that the parties have until July 17, 1996 to file written objections to this Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. *Thompson v. Nix,* 897 F.2d 356 (8th Cir. 1990). Such extensions will be freely granted. Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and set forth the basis for such objections. *See* Fed. R.Civ.P. 72; *Thompson,* 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985); *Thompson,* 897 F.2d at 357.

IT IS SO ORDERED.

---

**19.** In his post-trial brief Plaintiff refers to the consent decree in *Kane v. Brewer,* Civil No. 73–153–1 (S.D.Iowa as amended 1985). *Kane* is relevant to the qualified immunity issue because it incorporates the general requirements of prison disciplinary due process. A violation of a

consent decree, however, is not actionable under 42 U.S.C. § 1983. *DeGidio v. Pung,* 920 F.2d 525, 534 (8th Cir.1990). Civil contempt was not pleaded nor was it tried by consent of the parties. Fed.R.Civ.P. 15(b).